```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF TENNESSEE
                         NASHVILLE DIVISION

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,             )
                               )
v.                             )    No. 3:07-00062
                               )    JUDGE ECHOLS
ANTHONY MEYERS,                )
                               )
        Defendant.             )
```

## MEMORANDUM

Pending before the Court is Defendant Anthony Meyers' Motion to Suppress Evidence (Docket Entry No. 23) to which the Government responded in opposition (Docket Entry No. 24). The Court held a suppression hearing on September 12, 2007.

## I. FACTS

At 1:20 a.m. on September 27, 2006, a dispatcher for the Metropolitan Nashville Police Department issued an alert to all south dispatch patrol cars advising them of an attempted armed robbery at the O'Charley's restaurant located at 923 Bell Road in Nashville near the Hickory Hollow Mall. The dispatcher described the suspect as: "Male black, sweat shirt, black pants. Showed small gun to the caller and wanted money. Subject left on a blue bike. Unknown direction of flight." (Gov't. Exhibit 3.)

Officer Brad Williams (Unit 321C) responded to O'Charley's to interview the caller. Other officers, including Sgt. Beddoe (3F10), Officer Bouton (Unit 331C) and Detective Brian Murphy (3F14) responded to the Bell Road/Interstate I-24 area to look for the described suspect.

Detective Murphy called back to ask the dispatcher, "Was that bike like in bicycle or bike as in motorcycle?" The dispatcher responded, "I believe its bike as in a bicycle." (Gov't. Ex. 3.) Officer Bouton radioed to Officer Williams who was at O'Charley's: "as soon as you get a description give it to me. Just uh, double check that information[.]" (Id.)

After interviewing the two alleged victims at O'Charley's, Officer Williams radioed: "Suspect gonna be approximately 30, Male black, wearing a red hooded sweatshirt. It's gonna be a black ball cap. He's gonna be about six foot tall. It's gonna be a blue mountain bike style type that he fled on foot. He had a small caliber handgun on him." (Id.) Detective Murphy asked Officer Williams: "Does he have any idea what direction he went on the bike?" (Id.) Officer Williams responded: "Victims stating here that he actually left on his bike towards . . . the interstate. . . here on Bell. That's not necessarily where he went, but that's [where] they saw him go here from O'Charley's." (Id.) The officers continued to look for the suspect.

Detective Murphy was near the Daily's Shell service station at Cane Ridge and Bell Road. This location was approximately one-half mile from O'Charley's on the other side of Interstate 24. (Gov't. Ex. 1 (yellow mark is O'Charley's; pink mark is area behind Daily's).) Detective Murphy spotted a black male, at least six feet in height, dressed in a red hooded sweatshirt, black pants and a white ball cap standing by a pay phone and talking on the telephone. He noticed a blue bike leaning against a wall near the

2

suspect. The service station parking lot was well-lit and the suspect was the only person on the lot.

While observing the suspect, Detective Murphy radioed Officer Williams:

> **Officer Murphy (3F14):** . . . what kind of bike? . . . did they have a color or any . . . specifics about it?
>
> **Unit 321C [Officer Williams]:** It's gonna be a blue colored . . . mountain style . . . mountain bike style.
>
> **Officer Murphy (3F14):** . . . what was the guy wearing?
>
> **Unit 321C:** A red shirt, black ball cap.
>
> **Officer Murphy (3F14):** Black ball cap? I got a . . . I think he's a male black, with a red shirt, it has writing on the back with a white ball cap on and . . . black pants.
>
> **Unit 321C:** That's gonna be him because they weren't sure if it was . . . black or white ball cap. They agreed it was a red shirt.

(Id.) Other officers proceeded to the location to provide back-up for Detective Murphy. Officer Williams reminded Detective Murphy that "[h]e's gonna have a pistol on him." (Id.)

Detective Murphy pulled his patrol car in front of the suspect, got out of the car, pointed his shotgun at the suspect and ordered him to the ground. Officer Gerry Hutcheson and Sgt. Beddoe arrived on the scene. Sgt. Beddoe also pointed his shotgun at the suspect, and Officer Hutcheson pointed his service revolver. Officer Hutcheson approached the suspect to handcuff him. As he did so, Detective Murphy asked the suspect, later identified as the Defendant, if he was armed. The Defendant stated: "I have a pistol in my right front pocket; please don't shoot me, I won't give you

3

any trouble." Officer Hutcheson handcuffed the Defendant and recovered a two-shot silver Derringer pistol with a brown handle from the Defendant's right front pocket. The Defendant was not given a <u>Miranda</u> warning before Detective Murphy asked him if he was armed.

Approximately fifteen minutes elapsed between the time the dispatcher issued the initial attempted armed robbery alert and the time the Defendant was taken into custody. Officer Murphy transported the Defendant to the parking lot of O'Charley's for a show-up. The Defendant was removed from the car. The alleged victims could see the Defendant, but the Defendant could not see the victims. Both alleged victims identified the Defendant as the man who had approached them with a gun.

George Bouton, a crime scene investigator, responded to the O'Charley's parking lot and took custody of the firearm from Detective Murphy. Investigator Bouton approached Detective Murphy, who was standing near his patrol car, and asked Murphy where he found the pistol. The Defendant, who was sitting in the back seat of the patrol car, answered Investigator Bouton's question, stating "right front." Defendant's comment startled Investigator Bouton, as he was not aware the Defendant was sitting in the patrol car. Defendant was not under custodial interrogation at this time, and no <u>Miranda</u> warning had been given.

There is some question in the record whether the Defendant attempted to rob the alleged victims of $50 or whether he showed the alleged victims the pistol and offered to sell it to them for

4

$50. (Def. Exs. 1& 2, Video and Transcript of state court preliminary hearing on state charge). The Court need not decide whether an attempted aggravated robbery actually occurred because the Defendant is charged federally with being a felon in possession of a firearm.

The Court does find, however, that all of the police officers involved in this investigation reasonably relied on the dispatcher's initial alert of an attempted armed robbery at the O'Charley's, as well as the information Officer Williams promptly radioed after his interview with the alleged victims at the O'Charley's parking lot. The Court finds that the investigation was not launched based on an anonymous tip to the police, as Defendant contends, but on a telephone report of an attempted armed robbery called in to the police by one of the alleged victims immediately after the incident occurred. Within minutes of that telephone call and the dispatcher's alert, Officer Williams met the alleged victims face-to-face at the O'Charley's parking lot and interviewed them to obtain statements about the alleged offense and a description of the alleged robber.

Defendant correctly pointed out in cross-examination that several discrepancies appear in the testimony given by Detective Murphy at the federal suppression hearing and at the state-court preliminary hearing. Detective Murphy previously testified that he contacted the dispatcher to confirm what the suspect was wearing and she stated the suspect was wearing a red t-shirt and white pants, whereas Detective Murphy testified at the suppression

5

hearing that he confirmed the suspect was wearing a red sweatshirt and black pants. Detective Murphy testified at the state-court hearing that he remembered seeing several subjects on bicycles that evening in the area off Bell Road and I-24, and he stated he spotted a bicycle against the wall of the convenience store and then noticed the Defendant sitting on the ground near the pay phone, not standing, with a payphone in his hand. (Def. Ex. 2.) Additionally, the Defendant pointed out during the suppression hearing that the alleged victims said the suspect was wearing a black ball cap while he was wearing a white ball cap, and the alleged victims described the suspect as approximately six feet tall, while the Defendant stands about 6'6" tall.

The Court finds that these discrepancies are outweighed by Detective Murphy's clear testimony at the suppression hearing that he re-confirmed the physical description given by the alleged victims of the suspect while he simultaneously observed the Defendant at the Daily's service station. Daily's was located one-half mile from O'Charley's along the route of travel the suspect was alleged to have taken from O'Charley's. The alleged victims' description of the suspect--dressed in a red sweatshirt, black pants, and ball cap on a blue bicycle--completely matched the Defendant's appearance with the exception of the color of his ball cap. Before taking any action, Detective Murphy specifically reported to Officer Williams that the suspect he was watching matched the description of the suspect in all respects except that the man was wearing a white ball cap, not a black ball cap.

6

Officer Williams assured Detective Murphy that he had located the suspect described because the alleged victims could not agree on whether the ball cap was white or black. Based on that assurance, Detective Murphy arrested the Defendant. Although Defendant is approximately six inches taller than the suspect described, this variation in height is of no consequence because the alleged victims positively identified the Defendant after his arrest as the man who approached them.

## II. ANALYSIS

It is undisputed that Detective Murphy placed the Defendant under arrest the moment he pointed his shotgun at the Defendant and ordered him to the ground. No investigative stop under Terry v. Ohio, 392 U.S. 1 (1968) occurred.

To determine if Detective Murphy had probable cause to arrest the Defendant, the Court examines the events leading up to the arrest and then decides whether the historical facts, viewed from the standpoint of an objectively reasonable police officer, amounted to probable cause. See Maryland v. Pringle, 540 U.S. 366, 371 (2003); Ornelas v. United States, 517 U.S. 690, 695 (1996); United States v. Watson, 423 U.S. 411, 424 (1976). The probable cause standard is a "practical, nontechnical conception'" responding to "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Illinois v. Gates, 462 U.S. 213, 231 (1983) (quoted case omitted). Probable cause is a fluid concept that turns on the assessment of probabilities in a particular factual

7

context and is not "readily, or even usefully, reduced to a neat set of legal rules." Id. at 232.

Probable cause exists when the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the Defendant committed or was committing an offense. See United States v. Thomas, 11 F.3d 620, 627 (6th Cir. 1993). Probable cause means more than bare suspicion but less than evidence which would justify conviction. Id. A police officer's reliance on an eyewitness report that a crime occurred will establish probable cause unless there is an apparent reason for the officer to believe that the eyewitness was lying, that he did not accurately describe what he had seen, or that he was in some fashion mistaken regarding his recollection of the confrontation. United States. Harness, 453 F.3d 752, 754 (6th Cir. 2006).

Under Tennessee law, an officer may make a warrantless arrest "[w]hen the person has committed a felony, though not in the officer's presence," or "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested has committed the felony." Tenn. Code Ann. § 40-7-103(a)(2) & (3). Attempted aggravated robbery, which involves the intentional or knowing theft of property from the person of another by violence or putting the person in fear[,]" as well as the "display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[,]" is a Class B felony. Tenn. Code Ann. § 39-13-401(a); § 39-13-402(a)(1) & (b).

8

Applying these authorities to the facts and circumstances of this case, the Court concludes that Detective Murphy had probable cause to arrest the Defendant for felony attempted aggravated robbery when he spotted the Defendant at the Daily's at Cane Ridge and Bell Road. Detective Murphy possessed reasonably trustworthy information about the occurrence of a crime and the description of the suspect from the police dispatcher who spoke with one of the alleged victims and from Officer Williams who interviewed both alleged victims. Detective Murphy acted on more than a bare suspicion. The information Detective Murphy possessed would lead a prudent police officer to believe that the Defendant, who matched the description provided, had committed an attempted aggravated robbery at O'Charley's.

The Defendant contends, based on the evidence introduced at the state preliminary hearing, that no attempted robbery occurred; rather, the Defendant merely sought to sell the firearm to the individuals he encountered in the O'Charley's parking lot. The Defendant presented no evidence however, that at the time Detective Murphy effectuated the arrest, Detective Murphy had reason to believe that the alleged victims lied about the attempted robbery, that the alleged victims did not accurately describe what they had seen, or that the alleged victims were mistaken regarding their recollection of the incident. See Harness, 453 F.3d at 754.

The case of Florida v. J.L., 529 U.S. 266 (2000) does not apply under the facts of this case. At issue in J.L. was an anonymous tip to the police. Here, as explained above, the report

9

of an attempted crime to the police was not anonymous. Both of the alleged victims were interviewed in person by Officer Williams shortly after the incident at the scene of the alleged crime to obtain a statement of the offense and a description of the suspect.

Incident to the arrest, Detective Murphy and Officer Hutcheson had lawful authority to search the Defendant for any weapons on his person or within his control. United States v. Hudgins, 52 F.3d 115, 118 (6th Cir. 1995). Under the public safety exception to the Miranda rule, it was permissible for Detective Murphy to ask the Defendant whether he was armed in order to secure the officers' safety. See United States v. Williams, 483 F.3d 425, 428 (6th Cir. 2007) (noting public safety exception applies when officers have reasonable belief based on articulable facts that they are in danger). Detective Murphy had reliable information that the Defendant was armed when, less than fifteen minutes earlier, the Defendant displayed a small pistol to the alleged victims. Upon learning Detective Murphy had located the suspect at Daily's, Officer Williams warned Detective Murphy on the radio, "He's gonna have a pistol on him." Thus, it was reasonable for Detective Murphy to ask the Defendant, without first Mirandizing him, whether he had a weapon on his person in order to ensure the safety of all officers on the scene. Defendant's statement that he had a pistol in his right front pocket is admissible in evidence, as is the firearm Officer Hutcheson retrieved from the Defendant's pocket in a search incident to arrest.

10

Finally, the Defendant was not subject to custodial interrogation at the time Investigator Bouton asked Detective Murphy where the gun came from and the Defendant responded from the back seat of the patrol car, "right front."  See United States v. Cole, 315 F.3d 633, 636 (6th Cir. 2003) (noting Supreme Court defined "interrogation" as "words or actions on the part of police officers that they should [know are] reasonably likely to elicit an incriminating response.") Investigator Bouton directed his question to Detective Murphy, not to the Defendant, and Investigator Bouton was startled by the Defendant's response because he did not even know the Defendant was sitting in the patrol car.  The Defendant volunteered his response of his own accord without prompting by either officer standing near the car.  Therefore, Defendant's voluntary statement is admissible in evidence.  Id.

### III. CONCLUSION

For all of the reasons stated, Defendant Meyers' Motion to Suppress Evidence (Docket Entry No. 23) will be denied.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE